Argued June 22, affirmed September 19, 1922.

IN RE GUARDIANSHIP OF THOMAS PRINCE.

(209 Pac. 90.)

**Guardian and Ward—Under Statute, Guardian's Compensation in Court's Sound Discretion, Reviewable Only for Manifest Abuse.**

1. Under Section 1340, Or. L., providing that a guardian shall have such compensation as the court in which his accounts are settled shall consider just and reasonable, the amount to be allowed is in the sound discretion of such court, and its determination will not be disturbed on appeal, unless there clearly appears a manifest abuse of that discretion, or that the allowance, in view of time, talent and character of service, is disproportionate or not equivalent to the service performed.

Guardian and Ward—Assistance to Guardian and Cost Thereof Considered in Fixing His Compensation.

2.  The assistance to a guardian of brokers, accountants and attorneys, and its cost to the estate, is to be taken into account in fixing his compensation.

Guardian and Ward—Understanding Before Appointment not Controlling on Court in Fixing Guardian's Compensation.

3.  Understanding of guardian, before consenting to assume duties, with those petitioning for his appointment, that he should have more than the ordinary compensation, did not create a legal obligation, the ward being incompetent, and the other petitioners without authority to bind his estate, and did not control the court's discretion, though it had a right to give some weight to the fact of such understanding.

Guardian and Ward—Consent of Some of Deceased Ward's Legatees Immaterial on Amount of Guardian's Compensation.

4.  The consent of some of the legatees of the deceased ward to allowance of a certain amount to the guardian for his compensation, not being binding on the others, can have no influence on the amount of award.

Guardian and Ward—No Abuse of Discretion in Fixing Guardian's Compensation.

5.  Under facts of the case, *held*, that a guardian of an incompetent, whose tenure extended over two years, was not entitled to compensation in excess of the $25,000 allowed, and that the court did not exceed or abuse its discretion in fixing such amount.

From Multnomah: George Tazwell, Judge.

Department 2.

AFFIRMED.

For appellant there was a brief over the name of *Messrs. McCamant & Thompson,* with an oral argument by *Mr. Wallace McCamant.*

For respondents there was a brief over the names of *Mr. D. P. Price, Mr. Rogers MacVeagh* and *Messrs. Teal, Minor & Winfree,* with an oral argument by *Mr. Price.*

For Dr. H. F. Ong there was a brief over the name of *Mr. C. M. Idleman.*

McCOURT, J.—This is an appeal by Winthrop Hammond from an order of the Circuit Court for Multnomah County, fixing his compensation as guardian of the estate of Thomas Prince, a person incapable of conducting his own affairs. The guardian was appointed January 3, 1918, and his trust terminated by the death of the ward, February 3, 1920.

1. Section 1340, Or. L., provides:

"Every guardian shall be allowed the amount of all his reasonable expenses incurred in the execution of his trust, and shall also have such compensation for his services as the court in which his accounts are settled shall consider just and reasonable."

The court allowed the guardian as compensation, $25,000. He made a claim for $100,000. Under a statute such as that above set forth, the amount of compensation to be allowed a guardian is within the sound discretion of the court in which the guardian's accounts are settled, and the determination of the court in fixing the allowance will not be disturbed on appeal, unless it clearly appears that there has been a manifest abuse of that discretion, or that the amount allowed, in view of the time, talent and character of service employed in the management of the trust estate, is disproportionate or not equivalent to the services performed: 21 Cyc. 173; *In re McCullough's Estate,* 31 Or. 86, 94 (49 Pac. 886); *In re Assignment of Bank of Oregon,* 32 Or. 84, 90 (51 Pac. 81); *In re Assignment of Woodall,* 33 Or. 382, 384 (54 Pac. 209).

At the time the guardian was appointed to administer his affairs, Thomas Prince was 77 years of age. While in his prime, he had been a successful manufacturer in Worcester, Massachusetts, where he established an industry operated and conducted under

the name of the Reed-Prince Manufacturing Company, in which he at all times owned and held a large interest, yielding at the time of the guardianship dividends of more than $5,000 per month. Mr. Prince retired from the active management of his manufacturing business before 1898 and intrusted the same to younger men; and at the time of the appointment of the guardian, William L. Ames, a nephew, was acting as trustee of those interests for Mr. Prince under an appointment theretofore made by the latter.

On retiring from business, Thomas Prince came to Oregon, and interested himself in walnut culture in Yamhill County; he acquired several pieces of valuable land in Yamhill and Washington Counties, and invested moderate sums of money in several local enterprises, such as a creamery company and fruit cannery. He also purchased a number of small tracts of land jointly with other persons, and advanced considerable sums of money to those associated with him in such purchases.

In 1915 his faculties had become somewhat impaired by ill health and advanced age, in which condition he was induced by one O. K. Jeffrey to consent to finance the construction of dwelling-houses situated upon lots in Portland, Oregon, which lots were acquired or controlled by Jeffrey. The money so advanced was to be repaid upon the sale of the dwellings so constructed. The enterprise was conducted under the unincorporated firm name of Oregon Home Builders, Jeffrey being the active head thereof: the dwellings did not sell readily, and from its inception, the concern lost money.

In May, 1917, Mr. Prince suffered a stroke of paralysis, in connection with which he was compelled

104 Or.—43

to undergo a surgical operation, whereby he was confined in a hospital for several months. Jeffrey acquired a tract of land, and while Mr. Prince was convalescing the Oregon Home Builders erected a plant thereon for the manufacture of aeroplanes; Jeffrey prevailed upon Mr. Prince to advance the funds required to construct the plant and also to agree to advance the money necessary for the weekly pay-roll of those employed in the manufacture of aeroplanes, amounting to about $1,000 per week. By January 1, 1918, Mr. Prince had advanced in cash to the Oregon Home Builders about $157,000, and in addition had incurred a number of large obligations, including that of the pay-roll above mentioned. In part payment of the funds so advanced, Jeffrey, in the name of the Oregon Home Builders, had conveyed to Mr. Prince, at excessive prices, nineteen or more dwelling-houses in Portland, Oregon, with the land upon which they were situated and a tract of acreage in Clackamas County, also eight sales contracts for the sale of dwelling-houses. All of the properties so transferred were encumbered, and together they represented equities having a value of about $50,000. Mr. Prince had been compelled to borrow large sums to meet the demands for money made by Jeffrey, to secure some of which he had placed mortgages upon his real property in Washington and Yamhill Counties.

Stanley Simmons, a favorite grandnephew of Mr. Prince, visited the latter in December, 1917, and discovered that his affairs had become badly involved because of the large demands made upon his cash resources by Jeffrey, and also that Mr. Prince in his enfeebled condition of body and mind was incapable of administering the properties belonging to his es-

tate or of conducting his own affairs so as to stop further losses, whereupon it was decided, with the acquiescence of Mr. Prince, to place his affairs under the management of some competent person. Winthrop Hammond was an old acquaintance in whom Mr. Prince had full confidence, and he desired that Hammond be intrusted with the management of his affairs. It was decided that the appointment of Hammond as guardian of the estate of Prince was the best method of bringing about that result. Accordingly, Mr. Prince, Harold Prince, his son, and Stanley Simmons joined in a petition for the appointment of Hammond as guardian, upon which petition the order appointing Hammond as such guardian was made. The son, Harold Prince, had little or no business ability.

An appraisement of the estate disclosed assets of approximately $441,000, including real property appraised at $333,641.15 and personal property, consisting of tools, implements, office furniture, livestock, corporate stock, notes, accounts and demands of various kinds, appraised at $108,528.36. Much of the personal property was of a character that cash could not be readily realized thereon. The indebtedness of the estate was approximately $210,000. About $94,000 of this indebtedness consisted of mortgages, liens and taxes upon the real property of the estate. The ward had outstanding, his unsecured promissory notes for $28,277.64; one note for $10,-000 had been given a bank in Worcester, Massachusetts, and was then overdue; payment of this note was extended for a year or more. Some other notes and obligations, including claims for mechanics' liens and taxes, were about to mature. There was included in this indebtedness an item of $30,000,

due to the government as income tax, which was readily adjusted by the guardian by paying $6,600. There was also a claim of Dr. Ong for $12,500, for performing a surgical operation upon the ward, which the guardian settled without a great deal of controversy for $1,250.

The connection of the ward with the aeroplane plant above mentioned was the most serious matter that confronted the guardian upon assuming his trust. Relief was obtained by closing down the plant at once, thereby terminating the necessity of meeting a pay-roll. A corporation was formed, known as the Broadway Investment Company. Two thirds of the capital stock of this corporation was issued to the Prince estate and one third to Jeffrey. The stock of the latter was placed in control of the guardian to secure the estate for sums it would be required to advance to satisfy obligations against the plant. The world war was in progress at the time, and shortly thereafter the plant was sold for $40,-000, the purchaser assuming an encumbrance of $20,000 against the property thereof. In this manner the estate was relieved of the obligation of the pay-roll, the encumbrance against the property and besides recovered $40,000 of the moneys advanced at the solicitation of Jeffrey.

Most of the houses that had been conveyed to the ward by the Oregon Home Builders were occupied by tenants at the time the guardian took over the management of the estate. From these and obligations due the estate, the guardian received a considerable income. Among the assets of the estate at the time the guardian took the same over, was cash amounting to between $4,000 and $5,000. He received large remittances, the proceeds of dividends,

from the eastern holdings of the ward. By means of sums of money so received, the guardian was enabled to discharge the obligations of the ward as they matured, and also to liberally supply the personal wants of the ward. During the administration of the estate, the guardian received from the trustee of the ward's eastern holdings, over which he did not exercise any authority, $133,750. As above stated, these assets belonging to the ward and located in Massachusetts, were administered by a trustee; they represented a value in excess of $750,000.

The guardian determined, with the advice and consent of the relatives of the ward, to relieve the estate of the difficulties and expenses of administering the numerous real properties belonging to the estate and conveyed to the ward by the Oregon Home Builders, and steps were taken shortly after the appointment of the guardian to sell and dispose of the same. In furtherance of that policy, the guardian disposed of all but two or three of those properties for an aggregate consideration of $128,835.65, and satisfied encumbrances thereon of $65,534.77. The sale price was considerably less than the price for which the properties had been conveyed to the ward, but was only a little less than the value placed thereon by the appraisers. The guardian paid to brokers, for making the sales, a little more than $3,900. He received as the proceeds of the sales of personal property, $51,336, and collected upon notes and accounts, $20,046. With the funds so received, the guardian discharged all of the indebtedness of the ward, except a mortgage for $8,500, which encumbered a tract of land in Clackamas County, known as the Oregon

City Farm, that had been conveyed to the ward by Oregon Home Builders, at a price of $38,500. This tract of land probably is not worth more than the mortgage against it.

The guardian expended more than $65,000 in providing for the personal comfort and needs of the ward. In addition to looking after, caring for and investigating the value of, the numerous properties of the estate, the guardian, outside the strict limits of his duty, gave close attention to the personal wants of the ward, in an effort to relieve him, as far as possible, of worry and trouble, and to supply him with all the comforts, as well as many of the luxuries, to which his wealth entitled him.

The ward was not wholly incompetent, and while in Oregon made daily visits to the guardian, at the store conducted by the latter, where he was able to give the guardian much valuable information concerning his affairs; thereby the guardian was materially assisted in removing many of the difficulties into which the estate had fallen. The guardian gave the greater part of his time, for the first few months of his administration, to the management of the estate, but he was able to retain the management of a large retail merchandise store, conducted by him in the City of Portland.

After the first six months, the management of the estate did not make so great demands upon his time. In his final report the guardian shows assets upon hand amounting to approximately $349,000. He collected from all sources $335,759.10, and disbursed $338,178.91, and had on hand at the conclusion of his trust, $2,630.19. The foregoing disbursements do not include the following items:

Whitfield, Whitcomb & Co..........$ 1,000.00
Pacific State Fire Insurance Co......   241.50
Mrs. E. A. Lundy..................    75.00
Middleton & Clark, Attorneys, balance
    of fees .......................  6,500.00
Wallace McCamant, Attorney's fees..  2,000.00
Guardian's Compensation ...........  25,000.00

                Total........$34,816.50

Besides the services of brokers, alluded to above, the guardian, in the management of the estate, enlisted the services of competent attorneys. The attorneys so employed instituted one or two foreclosure suits, a partition suit and an action for money in connection with which an attachment was issued; they secured deeds to some of the property that the ward had purchased jointly with others, and in connection with which the ward had neglected to obtain title deeds. In a number of instances transactions were had with persons in whom Mr. Prince had implicit confidence, and he had not seen fit to exact written evidences of the obligations of such persons to him; these business transactions, with the aid of the attorneys, were placed upon a business-like footing. The services of the attorneys were required by the guardian in making up and presenting his accounts and in connection with the sales of both personal and real property that were made by the guardian and in the adjustment of controverted claims and the perfection of titles to the properties sold. The attorneys so employed also counseled and advised the guardian, and rendered professional services in respect to the aeroplane plant, and in connection with a brick manufacturing company in which the estate was interested. For the legal services thus rendered to the guardian, the court at the request

of the guardian, allowed $17,000. The guardian likewise had the assistance of office and clerical help, for which he expended approximately $100 a month, or $2,400, and the services of auditors and accountants, for which the estate was charged $2,408.

2. The expenditures of the guardian to brokers, accountants and attorneys for assisting him in the management of the trust estate amounted to about $25,000: the assistance so obtained and its cost to the estate should be taken in account in fixing the compensation of the guardian: 21 Cyc. 174.

Upon the hearing in the Circuit Court, Thomas J. Cleeton, an attorney and county judge of Multnomah County for several years during the time the County Court had jurisdiction of probate matters, testified that in his opinion $20,000 was a reasonable sum to be allowed the guardian as compensation for his services. No other witness was called to testify as to the amount of compensation to be allowed the guardian.

3. Before consenting to assume the duties of guardian, Hammond required, and those presenting the petition for the appointment of a guardian agreed, that he should have all necessary legal and clerical help, and that he should be compensated to a greater extent than the ordinary court fees. After the death of the ward, each of three legatees under his will, addressed a letter to the circuit judge, expressing a desire that the guardian be awarded compensation of not less than $35,000. One of these letters was written by Stanley Simmons, above mentioned. The guardian insists that the understanding he had with the petitioners for the appointment of a guardian, together with the letters mentioned, entitle him to larger compensation than would be the case in the

absence of such an understanding and without the request expressed in the letters.

The understanding relied upon does not have the essentials of a contract and did not create a legal obligation against the estate. Prince was incompetent to bind his estate, and the other petitioners had no authority to do so, and although the court, in arriving at the compensation that was just and reasonable under the circumstances, had a right to give some weight to the fact that such an understanding was had, such fact did not control the discretion which the statute vested in the probate court in respect to the amount of compensation to be awarded to the guardian.

4. The consent of three of the legatees to the allowance of a minimum compensation of $35,000 to the guardian could not bind others interested in the estate, and for that reason such consent properly could have no influence upon the amount of the award. If those legatees feel that the guardian is not adequately compensated by the allowance made by the Circuit Court out of the assets of the estate, they are at liberty to make up the deficiency from their respective portions of that estate.

5. We conclude that the guardian is not entitled to compensation in excess of that allowed by the Circuit Court, and that the court did not, by its order fixing the allowance, exceed or abuse its discretion.

The decree of the Circuit Court is affirmed.

AFFIRMED.

BURNETT, C. J., and BEAN and BROWN, JJ., concur.